IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

CAITLYN A. WILSON                                                    PLAINTIFF

VERSUS                                          CIVIL ACTION NO:1:22cv73-DAS

CLAY COUNTY, MISSISSIPPI, the Same Entity as
SHERIFF EDDIE SCOTT, In His Official Capacity
as the Sheriff of Clay County, Mississippi                         DEFENDANTS

---

**PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## I.  INTRODUCTION

Plaintiff Caitlyn A. Wilson files her Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment.  Wilson concedes the Family and Medical Leave Act and *quid pro quo* claims.

## II.  FACTS

Plaintiff Caitlyn A. Wilson (hereafter "Wilson") has a bachelor's degree from Mississippi State University in Animal and Dairy Science, with a concentration in veterinary medicine. Deposition of Caitlyn Wilson, p. 38, Exhibit "A."  However, Wilson was not accepted into veterinary school, and therefore began work in other areas of employment.  Deposition of Caitlyn Wilson, p. 39, Exhibit "A."  At age twenty-five (25), in September 2019, Wilson began work for the Clay County Sheriff's Department as an assistant to the criminal investigators.  Deposition of Caitlyn Wilson, pp. 140-141, Exhibit "A."

Defendant Sheriff Eddie Scott hired Wilson over the objection of the County Human Resources Department, Deposition of Caitlyn Wilson, pp. 93, 94, 207, Exhibit "A," who objected to Wilson's being hired because she had been arrested for selling alcohol to a minor when she had been working as a bartender, Deposition of Eddie Scott, pp. 6-7, Exhibit "B"; Deposition of Caitlyn Wilson, pp. 93-94, Exhibit "A," and because she had failed a drug test. Deposition of Caitlyn Wilson, pp. 93-94, 207, Exhibit "A."

Defendant Eddie Scott has been the Sheriff of Clay County since 2012. Deposition of Eddie Scott, pp. 5-6, Exhibit "B." Defendant Scott described Wilson's work as "good," and Wilson later took on the additional duty of writing grants. Deposition of Eddie Scott, p. 67, Exhibit "B;" Deposition of Caitlyn Wilson, pp. 202-203, Exhibit "A;" Deposition of Ramirez Williams, p. 12, Exhibit "C."

Defendant Scott knew that Wilson suffered from mental illness. Deposition of Eddie Scott, pp. 10-11, Exhibit "B." Wilson has been treated for multiple mental issues, including anxiety and depression, by Dr. Carl Sheehan, a psychiatrist in Tupelo, since 2013. Deposition of Caitlyn Wilson, pp. 30-32, Exhibit "A."

Defendant Scott is "close, close friend[s]" with his long-time secretary, Patty Stange. Deposition of Eddie Scott, p. 34, Exhibit "B." Stange told Wilson that she (Stange) and Defendant Scott, had engaged in a sexual relationship. Deposition of Caitlyn Wilson, pp. 11, 48-49, Exhibit "A." Wilson told Stange that she (Caitlyn Wilson) had engaged in sexual relationships with Deputy Jeremy Bell (with whom she lived with in Starkville), and on one occasion with Deputy Jimmy Pee. Deposition of Caitlyn Wilson, pp. 81, 117, Exhibit "A." The two (2) women were close, since Stange referred to Wilson as her "bestie." Deposition of Caitlyn Wilson, p. 11, Exhibit "A." Before

Wilson filed an EEOC charge, Defendant Scott and Wilson were friends. Deposition of Ramirez Williams, pp. 52-53, Exhibit "C."

Stange joined Wilson in a group text with Defendant Scott in approximately January 2021. Deposition of Caitlyn Wilson, p. 29, Exhibit "A." Beginning at that time, and continuing for approximately eight (8) months, Defendant Scott sent Stange and Wilson a series of sexually explicit text messages. *See* Exhibits 12-37 to Deposition of Eddie Scott, Exhibit "B," containing a variety of texts and social media posts asking the two (2) women (Stange and Caitlyn Wilson) to "service him," degrading women, referring to women as "hoes" and "bitches," and other derogatory language, and describing the benefits which women receive from giving oral sex to men. Deposition of Eddie Scott, pp. 56-75, and Exhibits 12-37 thereto.

On approximately September 2, 2021, Wilson was in Stange's office bending over a desk. Deposition of Caitlyn Wilson, pp. 76 - 83, Exhibit "A." Defendant Scott approached Wilson from behind, held her by her hips, and rubbed his crotch against her. Deposition of Caitlyn Wilson, pp. 76-83, Exhibit "A." Wilson could feel Defendant Scott's "junk" as he rubbed against her body. Deposition of Caitlyn Wilson, pp. 89-90, Exhibit "A." Patty Stange was present during the incident and commented: "What a dirty bastard." Deposition of Caitlyn Wilson, pp. 76, 87, Exhibit "A."

Wilson regarded the texts and the physical touching as sexual harassment. Deposition of Caitlyn Wilson pp. 72, 83-90, Exhibit "A."

A few days later, Defendant Scott threatened to fire Wilson, claiming that she had not followed an order that he had given her. Deposition of Caitlyn Wilson, p. 73, Exhibit "A;" Deposition of Eddie Scott, p. 46, Exhibit "B." A third-party ("Poncho") subsequently sent a text to Wilson explaining that the order she had disobeyed was an order not to list Neil Coker on the

Sheriff's Department Facebook page as the winner of a raffle, even though Neil Coker had, in fact, won the raffle. According to Defendant Scott, Coker had directed that the winner of the raffle be listed as Coker's grandson. Deposition of Eddie Scott, pp. 45-46, Exhibit "B."

Reacting to Defendant Scott's threat that he could "have her job" for not obeying his order about who to list on the Sheriff's Facebook as the winner of the raffle, Wilson told Defendant Scott that the only persons who could access the Sheriff's Department Facebook page so as to make a post were two (2) males, her boyfriend, Captain Jeremy Bell, and Investigator Stephen Young. Wilson testified she had no authority or ability to access the Sheriff's Department Facebook page and was, therefore, not responsible for the post to which Defendant Scott objected. Deposition of Caitlyn Wilson, pp. 45-46, Exhibit "A."

Wilson was upset that Defendant Scott had threatened her job since the only two (2) persons who could have made the social media post, males Young and Bell, were not the subject of any threats by Defendant Scott. In anger, Wilson sent a text protesting "sex discrimination," Deposition of Eddie Scott, Ex. "6," Exhibit "B," and angrily banged on a door. The door banging was witnessed by Stange, who reported it to Defendant Scott. Deposition of Caitlyn Wilson, p. 147, Exhibit "A." Wilson then complained to her immediate supervisor, Chief Deputy Ramirez Williams, both about Defendant Scott's having threatened her job and about the text messages Defendant Scott had sent her. Deposition of Caitlyn Wilson, pp. 60-61, Exhibit "A." Chief Deputy Williams responded by telling Wilson that she should stay away from Defendant Scott, that he would have to make a record of her complaint, and that he believed Defendant Scott's actions were "affecting her work." Deposition of Caitlyn Wilson, p. 60, Exhibit "A."

-4-

Wilson executed an EEOC charge on September 17, 2021, and the EEOC marked it "received on October 17, 2021." First Amended Complaint, Exhibit "E" thereto [20]. Shortly after November 9, 2021, Defendant Scott wrote a letter suspending Wilson from her employment, and directing that a review board (consisting of only Defendant Scott's subordinates), would decide whether to discharge her, effective November 22, 2021. Deposition of Eddie Scott, pp. 49-51, Exhibit "11" thereto, Exhibit "B." On advice of the county attorney, however, Defendant Scott did not carry out his plan to suspend and fire Wilson. Deposition of Eddie Scott, pp. 49-50, Exhibit "B."

Nevertheless, Wilson suffered a number of actions thereafter, which a reasonable jury could find made it impossible for her to continue to work at the Sheriff's Department. For example, Wilson's key fob was disabled, so she could not go to the conference room, where she had previously socialized and had lunch with her fellow employees. Deposition of Caitlyn Wilson, p. 63, Exhibit "A." She was not allowed to enter the "foyer area," or "break room area" except to clock in to work, Deposition of Caitlyn Wilson, pp. 63-69, 217-218, Exhibit "A," or to pick up a file. Deposition Caitlyn Wilson, p. 69, Exhibit "A." Through Chief Deputy Williams, Defendant Scott instructed that Wilson was to stay in her office. Deposition of Caitlyn Wilson, pp. 218-219, Exhibit "A." Other employees, including specifically the investigators for whom she was supposed to be directly working, would not speak to her. Deposition of Caitlyn Wilson, p. 208, Exhibit "A." Wilson ate lunch alone in her office, or in her car. Deposition of Caitlyn Wilson, p. 217, Exhibit "A." A Human Resources employee called Wilson to say that she had been accused of not working hours which she was claiming. Deposition of Caitlyn Wilson, p. 210, Exhibit "A." Defendant Scott

drove by her home in Starkville where she lived with her boyfriend, Captain Jeremy Bell, on several occasions. Deposition of Caitlyn Wilson, pp. 163-164, 208, Exhibit "A."

Investigator Stephen Young testified that some "deputies," whose names he could not recall, had asked him to investigate Wilson's EEOC charge. Deposition of Stephen Young, p. 9, Exhibit "D." Pursuant to that "investigation," Young received statements from employees about Wilson. Deposition of Stephen Young, p. 9, Exhibit "D;" Deposition of Eddie Scott, pp. 16-18, Exhibit "B." Young gathered statements from various employees, including Defendant Scott and other employees, alleging inappropriate behavior or sexual acts by Wilson. Deposition of Eddie Scott, pp. 17-18, Exhibit "B;" Deposition of Stephen Young, pp. 9-11, Exhibit "D." Chief Deputy Williams testified he did not know his subordinate Young was investigating Wilson. Deposition of Ramirez Williams, pp. 34-37, Exhibit " C." Defendant Scott testified he ordered the investigation. Deposition of Eddie Scott, p. 17, Exhibit " B."

Patty Stange gave a false statement claiming that Wilson had sex with a person who was making sales to the Sheriff's Department and spent the night with him in his hotel. Deposition of Caitlyn Wilson, pp. 117-18, Exhibit "A."

Deputy Kyle Eaves gave a false statement claiming that he had had sex with Caitlyn Wilson. Deposition of Caitlyn Wilson, pp. 195-196, Exhibit "A." Several Sheriff's Department employees told Wilson that they had been asked to write false statements about her. Deposition of Caitlyn Wilson, p. 161, Exhibit "A."

Prior to filing her EEOC charge, Wilson's relationship with other employees was "fine." Deposition of Ramirez Williams, p. 57, Exhibit "C." Wilson began to suffer from severe panic attacks, making it hard for her to breathe. Deposition of Caitlyn Wilson, p. 161, Exhibit "A."

-6-

Wilson's psychiatrist wrote a letter requesting that she be allowed to work from home on her "bad days." Deposition of Caitlyn Wilson, p. 17, Exhibit "A," and letter dated November 22, 2021 from Dr. Sheehan, Exhibit "2" to Wilson deposition; Deposition of Ramirez Williams, p. 38, Exhibit "C."

Defendant Scott recommended that the attorney for Clay County, to whom he took the letter, deny the request to work from home. Defendant Scott explained at deposition that he wanted the request denied because Wilson's job duties included handling evidence, and evidence could be handled only at the office. Deposition Eddie Scott, pp. 37-38, Exhibit "B." However, Wilson testified that she never received any answer to the psychiatrist's letter requesting that she be allowed to work from home on her "bad days." Deposition of Caitlyn Wilson, p. 157, Exhibit "A." Wilson testified that on previous occasions, she had been allowed to work from home. Deposition of Caitlyn Wilson, pp. 162-163, Exhibit "A;" Deposition of Ramirez Williams, pp. 40-41, Exhibit "C."

Regarding the texts from Defendant Scott, Wilson testified that she thought the texts were a "continuation" of what Defendant Scott had done in the past with female inmates, Amber Jones, Courtney Fitzgerald, and Jessica Clark. Deposition of Caitlyn Wilson, pp. 164, 166, 112-113, Exhibit "A." As explained in Wilson's sworn First Amended Complaint [20], paragraph 6:

> The apparent purpose of these text messages was to involve Plaintiff in a sexual relationship with Defendant Scott. Plaintiff had this fear, both because of the content of the text messages, and because of multiple reports coming from persons in positions to know, such as Clay County Sheriff's Department employees, that Defendant Scott was involved in sexual relations with several Clay County employees, including Strange, and with jail inmates.

Wilson's testimony that she feared Defendant Scott's sexual texts were a "continuation" of his relationship with other women, including inmates, was corroborated by depositions of former inmates.

In January 2019, Amber Jones, a former inmate, had posted on social media a detailed account the of Defendant Scott's having sex with her when she was in jail in 2017. Deposition of Amber Jones, pp. 5-13, Exhibit "E," Exhibit "1" thereto. Jones testified that Defendant Scott had given her a position as Patty Stange's assistant and, from that position, Defendant Scott would take her to a house at abandoned "Mary Holmes College," for repeated sexual encounters. Deposition of Amber Jones, pp. 5-13, Exhibit "E." Also, on one occasion, Jones and another inmate, Katie Howard, were taken to the Mary Holmes campus for sex with Defendant Scott, but Howard "freaked out," after which Stange picked the two (2) of them up and carried them back to the jail. Deposition of Amber Jones, p. 4, Exhibit "E;" Deposition of Patty Stange, pp. 49-50, Exhibit "F."

Jones testified that after her release from jail, she related her having sex with Defendant Scott while a prisoner at the jail to several persons, including Courtney Fitzgerald. Deposition of Amber Jones, p. 24, Exhibit "E." Courtney Fitzgerald was a criminal defendant, who had received a "suspended sentence," although charged with a charge involving the death of her child. Jones related that Fitzgerald had told her (Jones) that she (Fitzgerald) was having sex with Defendant Scott. Deposition of Amber Jones, p. 24, Exhibit "E."

At her deposition, Fitzgerald denied that either her suspended sentence, or her being taken from the jail and sent to rehab before seeing a judge, was a result of sex with Defendant Scott. Deposition of Courtney Fitzgerald, pp. 12-16, 19, Exhibit "G." Fitzgerald admitted, however, that she had sex with Defendant Scott when she "was 20, 21." Deposition of Courtney Fitzgerald, p. 19, Exhibit "G."

Fitzgerald was deposed after the deposition of her close friend, Carolyn Parker. Parker had testified at her deposition that Fitzgerald had told her that she (Fitzgerald) had had sex with

-8-

Defendant Scott in exchange for getting a ticket fixed. Deposition of Carolyn Parker, pp. 11-12, Exhibit "H." Fitzgerald also admitted in her deposition that she had told Attorney Jim Waide she had had sex with Defendant Scott, but said this was a lie and the statement was made only because she had been threatened by her boyfriend, Patrick Lippincott. Deposition of Courtney Fitzgerald, p. 94, Exhibit "G."

After revealing she had sex with Defendant Scott, Amber Jones alleged that drugs had been planted in her car. Deposition of Josh Fulgham, p. 10, Exhibit "I;" Deposition of Amber Jones, pp. 16-18, Exhibit "E." A former inmate, Josh Fulgham, was recorded stating that he is the person who planted drugs on Jones. Deposition of Josh Fulgham, pp. 6-8, Exhibit "I." Fulgham testified, however, that he had been coerced to make the statement saying he had planted drugs by a former girlfriend. Deposition of Josh Fulgham, pp. 11-12, Exhibit "I." Fulgham did admit that he had been in a car with Jones a "couple of days" before she was arrested on the drug charge. Deposition of Josh Fulgham, p. 13, Exhibit "I." According to Jones, Fulgham was in her car the very night before her arrest. Deposition of Amber Jones, p. 19, Exhibit "E."

Immediately after Fulgham's statement that he planted drugs on Jones, with the assistance of Deputy Kyle Eaves, Fulgham was arrested by Eaves. Deposition of Josh Fulgham, pp. 20-22, Exhibit "I." Then, from the jail, Fulgham gave another statement saying that everything Jones had said concerning both the planting of drugs and having sex with Defendant Scott was a lie. Deposition of Josh Fulgham, pp. 22-24, Exhibit "I."

At his deposition, Defendant Scott took the Fifth Amendment regarding whether he had sex with prisoners and regarding whether he had sex with Amber Jones in the jail. Deposition Eddie Scott, pp. 81-83, Exhibit "B."

Fulgham denied that he had any knowledge of any plan by jail inmate Nathan Sinko, to kill Amber Jones. Deposition of Josh Fulgham, p. 16, Exhibit "I." When Defendant Scott was asked about any discussions he had with Nathan Sinko concerning Jones, Defendant Scott, on advice of counsel, refused to answer. Deposition Eddie Scott, pp. 98-101, Exhibit "B."

In her deposition, Wilson described how she would wake up at night "freaked out" because of the Sheriff coming by her house. Deposition of Caitlyn Wilson pp. 163-164, Exhibit "A." Wilson described Defendant Scott as a "monster," who was getting worse, and testified that her fears that she considered her treatment as a "continuation" of what happened to Amber Jones, Courtney Fitzgerald, and Jessica Clark, and that she had "heard" the recording made by Joshua Fulgham. Deposition of Caitlyn Wilson, p. 164, Exhibit "A."

## III.  STANDARD OF REVIEW

*Tolan v. Cotton*, 572 U.S. 650, 660 (2014), reversed a grant of summary judgment because "[b]y weighing the evidence and reaching factual inferences contrary to competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."

This Court should not decide which party is more credible, but should "assume[] that twelve men know more of the common affairs of life than does one man, . . . [and] they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge." *Sioux City & P. R. Co. v. Stout*, 84 U.S. 657, 664 (1873). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Accepting as true testimony of interested witnesses is "not within the province of the court.

-10-

. . ." *Tolbert v. Queens Coll.*, 242 F.3d 58, 72 (2d Cir. 2001). The Court should accept as true only the evidence favoring the non-moving party, "that comes from disinterested witnesses." *Salitros v. Chrysler Corp.*, 306 F.3d 562, 569 (8th Cir. 2002). As stated in *Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401, 408 (1899): "[T]he mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact."

"'[A]ny layman is quite as competent' to answer ordinary cause-in-fact questions as 'the most experienced court.'" Brian S. Clarke, *A Better Route Through the Swamp: Causal Coherence in Disparate Treatment Doctrine*, 65 Rutgers L. Rev. 723, 757 (2013).

In deciding summary judgment, the Court is not to decide which party has the better of the arguments. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 153 (2000), reversed a grant of a directed verdict in an employment discrimination case because the lower court had concluded that the employer's evidence (a large amount of evidence of poor performance and lack of evidence that some decision-makers were biased) so overwhelmed the evidence favoring the petitioner, that no rationale fact finder could have found that the petitioner was fired because of his age. In reversing the Fifth Circuit, the United States Supreme Court wrote that the lower court "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Reeves*, 530 U.S. at 153.

## IV.   ARGUMENTS

### A.   CLAY COUNTY SHOULD REMAIN A DEFENDANT.

Defendants argue that only Sheriff Scott in his official capacity, not Clay County, should be a defendant. Plaintiff admits that this is the holding of *Oden v. Oktibbeha Co.*, 246 F.3d 458, 465

(5th Cir. 2001).

However, *Oden* overlooked the Fifth Circuit's long-settled interpretation of 42 U.S.C. § 2000e(b), which makes liable both "employers with fifteen or more employees,. . . ." and the "agent" of such employers. *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir. 1994), approved the holding in *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 584 (9th Cir.1993), cert. denied, 510 U.S. 1109 (1994), by stating: "In *Miller*, the court observed that the purpose of the 'agent' provision in § 2000e(b) was to incorporate respondeat superior liability into title VII."

A "sheriff should be considered an agent of the County." *Owens v. Rush*, 636 F.2d 283, 287 (10th Cir. 1980). Since a sheriff is an agent of the county, and since the Title VII definition of § 42 U.S.C. § 2000e(b) is meant to impose liability on a government for the acts of its agents, Clay County is liable for the acts of its agent, Sheriff/Defendant Scott.

*Oden* conflicts with the fundamental rule that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). While *Kentucky v. Graham* interpreted 42 U.S.C. § 1983, Wilson's case also contains a claim under 42 U.S.C. § 1983, since Wilson's equal protection claim is a claim under § 1983. *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014). (Holding a claim alleging constitutional violations need not cite 42 U.S.C. § 1983 in the complaint).

It has long been settled in the Fifth Circuit that claims brought under 42 U.S.C. § 1983 against a Mississippi sheriff for his official acts are acts of the county. *Hampton County National Surety, LLC, v. Tunica County*, 543 F.3d 221, 227 (5th Cir. 2008); *Huddleston v. Shirley*, 787 F.Supp. 109, 112 (N.D. Miss. 1992); and *Jauch v. Choctaw Co.*, 874 F.3d 425 (5th Cir. 2017).

Accordingly, this Court should keep Clay County, Mississippi as a defendant.

-12-

**B.      THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER DEFENDANT SCOTT'S SEXUAL ACTS CONSTITUTED AN ABUSIVE WORK ENVIRONMENT.**

Defendants claim that Defendant Scott's sending sexually-suggestive texts to Wilson over a period of eight (8) months, repeatedly referring to her with derogatory language, such as "hoes," "bitches," and suggesting she give him oral sex, followed by a sexual assault upon her, after which he threatened her job, should be held by this Court to be merely "playful sexual utterances," not constituting a hostile work environment. Defendants' Memorandum of Authorities in Support of Their Motion for Summary Judgment, pp. 9-10 [78].

Defendants' brief relies exclusively on several older Fifth Circuit cases, and especially upon the leading case of *Shepherd v. Comptroller of Pub. Accts. of State of Texas*, 168 F.3d 871 (5th Cir. 1999). *Shepherd* held that a coworkers' repeatedly placing his hand on the plaintiff's arm, and various off-color sexual comments, were not "severe and pervasive. . . ." so as to qualify as actionable sexual harassment. *Shepherd*, 168 F.3d at 874.

Similarly, *Hockman v. Westward Commc'ns*, LLC, 407 F.3d 317 (5th Cir. 2004), granted summary judgment where a press operator in the news room where the plaintiff worked engaged in mild sexual advances, which the Fifth Circuit determined to be "less egregious" than those involved in *Shepherd*. *Hochman*, 407 F.3d at 326.

*Shepherd* and *Hochman* both involved low-level employees, and require the harassment be "severe and pervasive." *Shepherd* and *Hochman* found that standard not met.

*Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396 (5th Cir. 2013), reversed a grant of summary judgment in a hostile environment Title VII case where two (2) male coworkers had hovered over the plaintiff's desk and sniffed her on twelve (12) different occasions, and one of them

had stared at her wearing shorts and appearing to be aroused.  *Royal*, 736 F.3d at 390.

In holding that summary judgment was improperly granted, the Fifth Circuit held that *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993), and *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428 (5th Cir. 2005), had discredited *Shepherd* and *Hochman*.  *Royal* held:

> However, both *Hockman* and *Shepherd* have been called into question by our court in *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428 (5th Cir.2005).  *Harvill* observed that each of these cases had applied the wrong legal standard when both required the conduct to be "severe and pervasive," even as the Supreme Court has made clear that the standard is "severe or pervasive."  *Harvill*, 433 F.3d at 434-35 (emphasizing that "severe or pervasive" is the verbatim standard enunciated in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 . . . (1986)).  *Harvill* noted that applying the wrong standard can lead to the wrong outcome. . . .

*Royal*, 736 F.3d at 402-03.

*Royal* noted that the "conduct at issue here could be seen as pervasive because it was compacted into a four-day period."  *Royal*, 736 F.3d 396, 403 (5th Cir. 2013).  Obviously, if conduct "into a four-day period" may be considered "pervasive," conduct involving some thirty-eight (38) incidents of texts over an eight (8) month period, followed by an incident of sexual assault, followed by a threat to one's job, could be considered both "severe" and "pervasive," even though *Harris* holds that "severe <u>or</u> pervasive" is the correct standard.

*Royal* also discredited the notion that the court could grant summary judgment because of lack of physical contact.  *Royal* stated: "Furthermore, we think that the magistrate judge also overemphasized the lack of physical contact.  Certainly, lack of physical contact is a factor to consider. But it is hardly dispositive."  *Royal*, 736 F.3d at 403.  *Royal* cited *Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir.1996), which upheld "a jury verdict against a judgment n.o.v. challenge where a coworker 'inquired about [the plaintiff's] sexual activity or made comments similarly offensive two or three times a week.'"  *Royal*, 736 F.3d at 403.  *Royal* also cited

-14-

*Glorioso v. Mississippi Dept. of Corrs.*, 193 F.3d 517, 1999 WL 706173, *4-6 (5th Cir. 1999), which had reversed summary judgment where the plaintiff's claim was based "on the plaintiff's perception that she had been sexually harassed when a coworker called her a 'bitch.'" *Royal*, 736 F.3d at 403.

*Royal* is supported by the Supreme Court's statement in *Harris*, that a sexually hostile work environment may be created by "discriminatory intimidation, ridicule, and insult. . . ." *Harris*, 510 U.S. at 21.

"A raft of case law, however, establishes that the use of sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch,' with which [the defendant] barrage[s] [the plaintiff] at work, has been consistently held to constitute harassment based upon sex." *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007).

*Royal* points out that the Supreme Court in *Harris* had emphasized the necessity to look at "at all the circumstances." *Harris*, 510 U.S. at 23. The necessity that a court, in evaluating sexual harassment claim must consider the totality of the circumstances has also been noted in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998), and in *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

The totality of the circumstances here includes the fact that the harassment was not by a coworker or even a low-level supervisor, but by the county's highest official. This official has made it plain that there are consequences for reporting his illegal sexual activities.

In evaluating a hostile work environment claim, the fundamental relevant factors are the "frequency . . . its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 17. Of these factors, the first three (3) clearly favor Wilson.

Under the totality of the circumstances, the issue of whether the work atmosphere was sufficiently hostile or abusive to meet Fifth Circuit standards should be determined by a jury.

Whether the work environment was hostile or abusive, is a question dealing with "mainsprings of human conduct. . . ." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1126 (5th Cir. 1978). "Litigants are entitled to have the jury draw those inferences or conclusions that are appropriate grist for juries." *Nunez*, 572 F.2d at 1124. "The first important right [under the United States Constitution Amendment Seven] is the right to have a jury decide whether the defendant's conduct violated or conformed to the applicable legal standard, rather than the more basic factual questions about 'what happened.'" William V. Dorsaneo, III, *Reexamining the Right to Trial by Jury*, 54 SMU L. Rev. 1695, 1699 (2001).

Accordingly, the Motion for Summary Judgment on the Title VII hostile work environment claim should be denied.

### C. THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER DEFENDANTS RETALIATED AGAINST WILSON BECAUSE SHE FILED AN EEOC CHARGE.

The Civil Rights Act of 1964 contains the following anti-retaliation provision: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge. . . ." 42 U.S.C. § 2000e-3(a).

"A plaintiff establishes a prima facie case for unlawful retaliation by proving (1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).

-16-

Defendants admit Element 1, since it is undisputed that Wilson filed an EEOC charge. Similarly, Defendants do not claim a lack of causal connection between actions against Wilson and the filing of the EEOC charge. Defendants' sole argument is that the actions taken were not serious enough to amount to a "materially adverse employment action." Defendants' Memorandum of Authorities in Support of Their Motion for Summary Judgment, p. 13 [78].

The actions taken include the following:

• Prohibiting Wilson from entering the foyer or breakroom where other employees ate lunch or took breaks. Deposition of Caitlyn Wilson, pp. 63, 69, 217-218, Exhibit "A."

• Other employees, including the investigators for whom she directly worked, refusing to speak to Wilson. Deposition of Caitlyn Wilson, p. 208, Exhibit "A."

• Accusing Wilson of making false claims of the hours she worked. Deposition of Caitlyn Wilson, p. 210, Exhibit "A."

• Defendant Scott's driving by Wilson's home in Starkville, Mississippi, on several occasions. Deposition of Caitlyn Wilson, pp. 163-164, Exhibit "A."

• Defendant Scott's Investigator Steven Young's obtaining multiple statements from fellow employees about Wilson, alleging unrelated sexual activity, including some statements which were false. Deposition of Caitlyn Wilson, pp. 116-118, 125, Exhibit "A;" Deposition of Steven Young, p. 9, Exhibit "D."

• Refusing to honor a psychiatrist's request that Wilson work from home when she was having panic attacks so severe that she struggled to breathe. Deposition of Caitlyn Wilson, pp. 17, 161, Exhibit "A," and Exhibit 2 thereto; Defendant of Eddie Scott, pp. 37-38, Exhibit "B."

-17-

A reasonable fact finder could find that the above actions constituted a "diminution in prestige or change in standing among her co-workers," which establishes the requisite adverse employment action under *Stewart v. Mississippi Transp. Comm'n,* 586 F.3d 321, 332 (5th Cir. 2009).

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 77 (2006), held that the anti-retaliation provisions of Title VII are broader than the substantive provisions of Title VII and can be met by any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Alito, Jr., concurring). Defendants' isolation of Wilson, requiring her to stay in her office, refusing to allow her to work from home, despite a psychiatrist's request, and Defendant Scott's driving by her home might deter a reasonable person from making a charge.

This Court should leave it to the jury to determine whether those multiple adverse actions against Wilson are so serious as to cause panic attacks, and Defendants' subsequent refusal to honor Wilson's psychiatrist's request, that she be allowed to work from home, are actions which would have "dissuaded a reasonable worker from making" a charge.

### (Constructive Discharge)

Although it is not necessary to prevail on her retaliation claim, Wilson has also produced sufficient evidence from which a jury could find that the retaliation was a constructive discharge.

The test for constructive discharge is whether "[the working conditions] [were] so difficult or unpleasant that [a] reasonable person in [the plaintiff's] shoes would have felt compelled to resign." *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 741 (5th Cir. 1993).

In *Russell v. City of Tupelo, Mississippi*, 544 F. Supp. 3d 741, 758 (N.D. Miss. 2021), District Judge Sharion Aycock noted in the context of the claim for constructive discharge that at the summary judgment stage, Plaintiff "need only establish the existence of material fact."

-18-

In this case, Plaintiff has established the existence of genuine issues of material fact as to whether a reasonable person in her position would resign. For example, Wilson's job was to act as the assistant for investigators. Yet, the investigators refused to speak to Wilson, and one gathered statements attacking Wilson on unrelated matters. Wilson was cut off from her fellow employees, some of whom signed false statements claiming that she had sex with officers other than her boyfriend and Deputy Jimmy Pee. Defendant Scott had, without the knowledge of Wilson's boss, Chief Deputy Ramirez Williams, caused Investigator Young to initiate an investigation of Wilson's sexual relationships with others, rather than actually making any good faith investigation of the sexual harassment directed against her by Defendant Scott.

Wilson could understandably have felt endangered because Defendant Scott was having sex with Amber Jones, an inmate. This is a felony. MISS. CODE ANN. § 97-3-104. Given Fulgham's video statement, it is reasonable to believe Defendant Scott's deputy (Deputy Eaves) planted drugs on Jones after she made her public post. Yet, despite Jones' public post about the crime of sex with a prisoner, Investigator Young never asked Defendant Scott about his having sex with Amber Jones. Deposition of Steven Young, p. 12, Exhibit "D."

*Hardy v. City of Tupelo, Miss.,* 2009 WL 3678262, *14 (N.D. Miss. 2009), upheld a jury verdict based, in part, upon constructive discharge in retaliation for opposing race discrimination. The claim was upheld based upon the plaintiff's testimony, that he had been removed "from internal affairs and subsequent reassignment to the patrol department unit. . . .," and that he had been made subordinate to officers of lesser rank, and that his fellow police officers had made threats against him. "In light of the above evidence, a reasonable jury could conclude that a reasonable employee in the Plaintiff's shoes would have felt compelled to resign." *Hardy,* 2009 WL 3678262, at *14.

-19-

In light of the retaliatory actions against Wilson, she "would have felt compelled to resign."

## C. DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON WILSON'S CLAIM OF SEX DISCRIMINATION.

Paragraph 15(b) of Plaintiff's First Amended Complaint charges: "Sex discrimination, in violation of Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. . . ." [20]. Defendants do not move for summary judgment on this sex discrimination claim. Therefore, Defendants' motion is only one for partial summary judgment.

Assuming Defendants' motion and brief asks for summary judgment on Wilson's sex discrimination claims, Wilson will briefly demonstrate why summary judgment should not be granted on those claims either under Title VII or the Fourteenth Amendment.

Title VII of the Civil Rights Act of 1964 makes it unlawful to "discriminate against any individual with respect to [her] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a).

*Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023), recently abandoned the Fifth Circuit's longstanding rule that this provision of Title VII requires proof of an "adverse employment action." *Hamilton* held that the plaintiff stated a claim for violation of Title VII when she alleged that the Dallas County Sheriff's Department allowed only men, but not women, to "select full weekends off." *Hamilton*, 79 F.4th at 497. *Hamilton* held that despite "60 years" of precedents, holding that a plaintiff has to demonstrate adverse employment action, it had "little difficulty concluding that they have plausibly alleged discrimination 'with respect to [their] ... terms, conditions, or privileges of employment.'" *Hamilton*, 79 F.4th at 503. "Title VII's text, on its face, is not limited to economically adverse employment actions, [and] the Supreme Court has repeatedly stated that Section 703(a)'s text "is not limited to 'economic' or 'tangible' discrimination." *Hamilton*, 79 F.4th

at 504. Defendant Scott's sexual harassment of only women and the threat of firing only a woman is sex discrimination.

There was no evidence that Defendant Scott's conduct, including the degrading sexual insults, were directed toward any employees other than female employees.

**(Equal Protection)**

The Fourteenth Amendment of the United States Constitution requires Equal Protection of the laws. "The Equal Protection Clause forbids sex discrimination no matter how it is labeled." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118-19 (2d Cir. 2004). To prevail on an equal protection claim, "the plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender," and, if there be discrimination, it can be tolerated only if there be an "exceedingly persuasive justification. . . ." for it. *Back*, 365 F.3d at 118.

Sexual harassment against a female is a Fourteenth Amendment violation. *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 426 (3d Cir. 2020).

Accordingly, and especially since Defendants have not filed any motion in Wilson's sex discrimination claim, Wilson's claim of sex discrimination, in violation of Title VII and in violation of the Equal Protection clause of the Fourteenth Amendment, should be denied.

**V.   CONCLUSION**

Plaintiff Caitlyn A. Wilson concedes Defendants are entitled to summary judgment on her Family and Medical Leave Act claim and on the *quid pro quo* sexual harassment claims. Otherwise, Defendants' Motion for Summary Judgment should be denied.

-21-

RESPECTFULLY SUBMITTED, this the 22nd day of November, 2023.

CAITLYN A. WILSON, Plaintiff

By:     */s/ JIM WAIDE*
        Jim Waide, MS Bar No. 6857
        waide@waidelaw.com
        Rachel Pierce Waide, MS Bar No. 100420
        rpierce@waidelaw.com
        Yance A. Falkner, MS Bar No. 106107
        yfalkner@waidelaw.com
        WAIDE & ASSOCIATES, P.A.
        332 North Spring Street
        Tupelo, Mississippi 38804
        Post Office Box 1357
        Tupelo, MS  38802-1357
        (662) 842-7324 / Telephone
        (662) 842-8056 / Facsimile

        *ATTORNEYS FOR PLAINTIFF*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that undersigned counsel for Plaintiff has this day filed the above and foregoing with the Clerk of the Court, utilizing the federal court electronic case data filing system (CM/ECF), which sent notification of such filing to the following:

**R. Jeff Allen, Esq.**
**Hunt Ross & Allen**
**P.O. Box 1196**
**Clarksdale, MS 38614**
**<u>rjallen@huntross.com</u>**
**<u>rj.allen@yahoo.com</u>**

DATED, this the 22nd day of November, 2023.

*/s/ Jim Waide*_____
JIM WAIDE